**In re Alex ZLETZ.**

No. 89–1093.

United States Court of Appeals, Federal Circuit.

Dec. 27, 1989.

Rehearing Denied Feb. 7, 1990.

Wallace L. Oliver, Amoco Corp., Chicago, Ill., argued for appellant. With him on the brief were Ralph C. Medhurst and William H. Magidson.

Fred E. McKelvey, Solicitor, Office of the Solicitor, Arlington, Va., argued for appellee. With him on the brief were Richard E. Schafer and John W. Dewhirst, Associate Solicitors.

Harry J. Roper, George S. Bosy and Nicholas A. Poulos, Neuman, Williams, Anderson & Olson, Chicago, Ill., were on the brief for amicus curiae, Phillips Petroleum Co.

Before MARKEY, Chief Judge, NEWMAN and MICHEL, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Dr. Alex Zletz appeals the decision of the United States Patent and Trademark Office (PTO) Board of Patent Appeals and Interferences, Appeal No. 88–1655 (August 31, 1988), rejecting claims 13 and 14, the only claims remaining in patent application Serial No. 03/462,480, filed October 15, 1954. We affirm.

### Background

The history of Patent Interference No. 89,634, called the "polypropylene" interference, has been recorded elsewhere, see *Standard Oil Co. (Indiana) v. Montedison S.p.A.*, 494 F.Supp. 370, 206 USPQ 676 (D.Del.1980), *aff'd*, 664 F.2d 356, 212 USPQ 327 (3d Cir.1981), *cert. denied*, 456 U.S. 915, 402 S.Ct. 1769, 72 L.Ed.2d 174, 215 USPQ 95 (1982), and is adequately described therein to the extent pertinent to this case. The single count of that interference was as follows:

> Normally solid polypropylene, consisting essentially of recurring propylene units, having a substantial crystalline polypropylene content.

Priority was awarded adversely to Zletz (assignor to Standard Oil Company (Indiana), now known as Amoco Corporation), one of five parties to the interference, and in favor of Hogan *et al.*, assignors to Phillips Petroleum Company.[1] Reference hereinafter to the "lost count" of the interference is to the above text.

Dr. Zletz, having lost the priority contest, returns his patent application to *ex parte* prosecution, in accordance with the rules. The claims at issue in the Zletz patent application are:

> 13. Normally solid polypropylene having a crystalline polypropylene content.
>
> 14. Normally solid polypropylene.

Zletz asserts that claims 13 and 14 are independently patentable to him, in that they are different from the lost count and are supported by work that predates any reference against him. The references are the Hogan *et al.* and Baxter patents issued on two of the other patent applications in the interference, which are references as of

---

1. Phillips Petroleum Company has filed a brief as *amicus curiae*, supporting the Board's deci- sion herein.

their filing dates under 35 U.S.C. § 102(e); and the lost count, which is a reference as of the invention date awarded to the prevailing party in the interference, in accordance with 35 U.S.C. § 102(g).[2] Zletz provided affidavit evidence under Rule 131 (37 C.F.R. § 1.131) to show that the experimental work on which he relies predates these reference dates; he also relies on the disclosures of his parent patent applications filed in 1951 and 1952.

The examiner found that Zletz's early work was directed to a species of copolymer that was patentably distinct from the subject matter of the lost count of the interference, but that Zletz had not shown prior invention of the generic subject matter that Zletz asserts is defined in claims 13 and 14. For this finding, the examiner relied on rulings of the district court in the polypropylene interference concerning Zletz's early work. The examiner also invoked interference estoppel against claim 13, stating that due to estoppel the practice set forth in *In re Frilette*, 436 F.2d 496, 58 CCPA 799, 168 USPQ 368 (1971), discussed *infra*, was not available to Zletz.

The Board affirmed the examiner's rejection of the claims, on somewhat different reasoning. The Board held that Zletz was estopped from relying on his 1951 and 1952 patent applications and early experimental work to antedate the effective dates of the cited references and the date of invention awarded to the lost count, based on the Board's interpretation of claims 13 and 14 as of identical scope to the lost count. The Board held that claims 13 and 14 are "interpreted as being directed to normally solid linear high homopolymers of propylene which have a crystalline polypropylene content", despite the broader words of these claims. On this claim interpretation, the Board held that claims 13 and 14 define the same subject matter as the lost count of the interference, and not a different, generic invention, and thus that Zletz is collaterally estopped from obtaining these claims by simply antedating the references and the lost count by the mechanism provided in Rule 131. This appeal followed.

### Claim Interpretation

■ The Board erred in its interpretation of claims 13 and 14, the error apparently flowing from the Board's choice of an inapplicable legal premise. The Board applied the mode of claim interpretation that is used by courts in litigation, when interpreting the claims of issued patents in connection with determinations of infringement or validity. *See, e.g., Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1021, 4 USPQ2d 1283, 1286 (Fed.Cir. 1987) (meaning of claims of issued patent interpreted in light of specification, prosecution history, prior art, and other claims). This is not the mode of claim interpretation that is applicable during prosecution of a pending application before the PTO.

During patent examination the pending claims must be interpreted as broadly as their terms reasonably allow. When the applicant states the meaning that the claim terms are intended to have, the claims are examined with that meaning, in order to achieve a complete exploration of the applicant's invention and its relation to the prior art. *See In re Prater*, 415 F.2d 1393, 1404–05, 56 CCPA 1381, 162 USPQ 541, 550–51 (1969) (before the application is granted, there is no reason to read into the claim the limitations of the specification). The reason is simply that during patent prosecution when claims can be amended, ambiguities should be recognized, scope and breadth of language explored, and clarification imposed. *Burlington Industries, Inc. v. Quigg*, 822 F.2d 1581, 1583, 3 USPQ2d 1436, 1438 (Fed.Cir.1987); *In re Yamamoto*, 740 F.2d 1569, 1571, 222 USPQ 934, 936 (Fed.Cir.1984). The issued claims

---

**2.** 35 U.S.C. § 102: A person shall be entitled to a patent unless—

\* \* \* \* \* \*

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, ... or

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it.

are the measure of the protected right. *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 232, 63 S.Ct. 165, 167, 87 L.Ed. 232, 55 USPQ 381, 383–84 (1942) (citing *General Electric Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369, 58 S.Ct. 899, 901–02, 82 L.Ed. 1402, 37 USPQ 466, 468–69 (1938)). An essential purpose of patent examination is to fashion claims that are precise, clear, correct, and unambiguous. Only in this way can uncertainties of claim scope be removed, as much as possible, during the administrative process.

Thus the inquiry during examination is patentability of the invention as "the applicant regards" it;[3] and if the claims do not "particularly point[ ] out and distinctly claim[ ]", in the words of section 112, that which examination shows the applicant is entitled to claim as his invention, the appropriate PTO action is to reject the claims for that reason. *Burlington Industries*, 822 F.2d at 1583–84, 3 USPQ2d at 1438; *In re Cormany*, 476 F.2d 998, 999–1001, 177 USPQ 450, 451–52 (CCPA 1973); *Prater*, 415 F.2d at 1404, 162 USPQ at 550 (claim that reads on subject matter beyond the applicant's invention fails to comply with 35 U.S.C. § 112).

It was incorrect for the Board to read unwritten limitations into claims 13 and 14, limitations contrary to the plain words of the claims, and contrary to the interpretation that the inventor himself placed on the claims. Claim 13, according to Zletz, does not require that the polymer consist essentially of recurring propylene units or that the crystalline content be substantial; and claim 14 requires neither crystalline content nor, according to Zletz, that the polypropylene be a homopolymer. The Board erred in holding that claims 13 and 14 must be read to include all the limitations of the lost count.

*Patentability*

■ A losing party to an interference is entitled to claim subject matter other than that of the interference count, provided the requirements of patentability are met, and subject to those constraints that flow from the adverse decision in the interference. *Frilette*, 436 F.2d at 499–500, 168 USPQ at 370–71; *In re Risse*, 378 F.2d 948, 955–56, 54 CCPA 1495, 154 USPQ 1, 7 (1967), *overruled in part on other grounds by In re Smith*, 458 F.2d 1389, 1395, 59 CCPA 1025, 173 USPQ 679, 683 (1972).

Zletz argues that the applicable law requires the grant of claims 13 and 14 because these claims define a different, generic invention as compared with the lost count. Zletz states that his early work shows conception and reduction to practice of the subject matter of claims 13 and 14, relying in part on the allowance of similar claims before the interference was declared. He argues that the court's ruling in the interference that he had not shown reduction to practice of the lost count based on his early work, including the court's ruling that his products lacked utility, does not serve as an estoppel because the requirements for proof of conception and reduction to practice are different in *ex parte* prosecution from that required to prove priority in an interference proceeding.

■ Rule 131[4] provides an *ex parte* mechanism whereby a patent applicant may antedate subject matter in a reference, even if the reference describes the same

---

3. 35 U.S.C. § 112 ¶ 2:
 The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

4. 37 C.F.R. 1.131. Affidavit or declaration of prior invention to overcome cited patent or publication.
 (a) When any claim ... is rejected on reference to a domestic patent which substantially shows or describes but does not claim the rejected invention ... the inventor ... shall make oath or declaration as to facts showing a com-

pletion of the invention in this country before the filing date of the application on which the domestic patent issued....
 (b) The showing of facts shall be such ... as to establish reduction to practice ... or conception ... coupled with due diligence from [the effective date of the reference] to a subsequent reduction to practice or to the filing of the application. Original exhibits of drawings or records, or photocopies thereof, must accompany and form part of the affidavit or declaration or their absence satisfactorily explained.

invention that is claimed by the applicant, provided that the same invention is not claimed in the reference when the reference is a United States patent. As explained in *In re McKellin*, 529 F.2d 1324, 1329, 188 USPQ 428, 434 (CCPA 1976), the disclosure in a reference United States patent does not fall under 35 U.S.C. § 102(g) but under 35 U.S.C. § 102(e), and thus can be antedated in accordance with Rule 131. But when the subject matter sought to be antedated is claimed in the reference patent, Rule 131 is not available and an interference must be had to determine priority. *In re Eickmeyer*, 602 F.2d 974, 979, 202 USPQ 655, 660 (CCPA 1979); *In re Clark*, 457 F.2d 1004, 1007, 59 CCPA 924, 173 USPQ 359, 361 (1972).

Thus a losing party to an interference, on showing that the invention now claimed is not "substantially the same" as that of the lost count, *Frilette*, 436 F.2d at 500, 168 USPQ at 371, may employ the procedures of Rule 131 in order to antedate the filing date of the interfering application. The lost count of the interference is not prior art against a different invention, for "'prior art' in the sense of section 102(g) cannot be the basis of a section 102(a) rejection, the invention not being *publicly* 'known or used'". *In re Taub*, 348 F.2d 556, 562, 52 CCPA 1675, 146 USPQ 384, 389 (1965) (emphasis in original). *See generally Wetmore v. Quick*, 536 F.2d 937, 943, 190 USPQ 223, 228 (CCPA 1976) ("The law developed in our Rule 131 cases has little bearing on the law relating to interference practice.")

 Zletz asks us to view the subject matter of the lost count as simply a species of polypropylene, and argues that the later discovery of a species does not bar the grant of generic claims to the earlier discoverer of a genus encompassing that species. Priority as to a genus may indeed be shown by prior invention of a single species, *Taub*, 348 F.2d at 562, 146 USPQ at 389, but the genus will not be patentable to an applicant unless he has generic support therefor. *In re Grimme*, 274 F.2d 949, 952, 47 CCPA 785, 124 USPQ 499, 501 (1960); *In re Kyrides*, 159 F.2d 1019, 1021–

22, 73 USPQ 61, 63 (CCPA 1947). *See In re Stempel*, 241 F.2d 755, 759–60, 44 CCPA 820, 113 USPQ 77, 81 (1957) (discussing what is necessary to successfully "swear back" of a reference under Rule 131, when the reference discloses a species of the applicant's generic claim).

 While there is not crystal clarity between the requirement in *Taub* that the applicant's earlier invention be patentably distinct from the lost count, and the holding in *Frilette* wherein it was sufficient for the applicant merely to antedate the lost count as to "different" subject matter that he was prevented from including in the interference, the issue raised in Zletz's case does not require resolution of this question as to all factual circumstances. There is a sufficiently consistent thread in this precedent insofar as it relates to the issue presented by Zletz; that is, the issue of species and generic claims.

In Zletz's case, he is not attempting to claim a different species from that described in the references and the lost count. He is seeking generic claims that he defines as including the subject matter of the lost count. To prevail, Zletz must show that he made the generic invention he is claiming. Even if Zletz's Rule 131 affidavits were sufficient to "swear back" of the references with respect to his early work, that does not go to the question of the sufficiency of Zletz's early work to show that he made a generic invention of the scope he attributes to claims 13 and 14.

Zletz argues that these claims are supported by his 1951 and 1952 disclosures, his experiments EP–34, 35, and 37A, and rulings made during the interference. The district court, in the polypropylene interference, held that Zletz had not actually reduced to practice the subject matter of the lost count based on the early work now relied on. *Standard Oil*, 494 F.Supp. at 399, 407, 206 USPQ at 705, 711.

The court held that Zletz's experiments EP–34 and 35 produced solid copolymers that included polypropylene components of varying degrees of crystallinity, separated by methylene sequences, and that these products did not meet the limitation of the

count "consisting essentially of recurring propylene units". *Id.* at 400–02, 206 USPQ at 706–08. Zletz now relies on this ruling to support the position that he made an invention different from and generic[5] to that defined in the lost count.

Experiment EP–37A was held inadequate in the interference proceeding because of insufficient evidence that the product met the limitation "consisting essentially of recurring propylene units". Zletz has now presented to the PTO, during this *ex parte* prosecution, newly discovered evidence of the crystalline content and composition of the EP–37A product. Zletz states that the product of EP–37A, as reproduced 36 years after the original experiment, contains at most 3% ethylene, and has a 68% or 72% crystalline component. The examiner observed that the original EP–37A was reported in Zletz's 1951 patent application to have a methylene to methyl ratio of 4, not significantly different from those of Runs EP–34 and 35, which the district court found to be copolymers. A polypropylene homopolymer would have a methylene to methyl ratio of about 1. Zletz's response is that the early method for measuring methylene to methyl ratios was inaccurate. However, these procedures, and their significance, were fully debated during the interference, under examination and cross-examination, and are not before us for *de novo* evaluation. To the extent that Zletz now asks that the examiner consider Zletz's new data, we conclude that the Board did not err in its holding that Zletz is collaterally estopped from relitigating issues determined in the interference.

We agree with the Solicitor that the evidence of EP–34 and 35 may support the patentability of an invention different from that of the lost count; but they do not support the patentability of claims 13 and 14 when these claims are given the scope

that Zletz states he intends them to have. Zletz has not shown that he made an invention generic to both the copolymers of his early experiments and the subject matter of the lost count. On this basis, the Board's decision is

AFFIRMED.

---

**5.** The Commissioner correctly points out that claims 13 and 14 as they are written do not clearly define the generic invention that Zletz states he intends these claims to cover. During the interference the examiner ruled that "polypropylene" means a homopolymer; that is, consisting essentially of recurring propylene units; and included this definition in the interference count. Zletz's asserted meaning of "polypropy-

lene" to include homopolymers and copolymers containing significant methylene sequences is contrary to the interference definition. Although Zletz refers to the district court's usage as supporting his own, we do not discern such looseness of usage in the district court's opinion as could extend "polypropylene" to encompass Zletz's copolymers.