**In re AMERICAN ACADEMY OF SCIENCE TECH CENTER.**

**No. 03–1531.**

United States Court of Appeals, Federal Circuit.

May 13, 2004.

John M. Collins, Hovey Williams LLP, of Kansas City, MO, argued for appellant.

C. Edward Polk, Jr., Associate Solicitor, Office of the Solicitor, United States Patent and Trademark Office, of Arlington, VA, argued for appellee. With him on the brief were John M. Whealan, Solicitor; and Linda Moncys Isacson, Associate Solicitor.

Barry E. Bretschneider, Morrison & Foerster LLP, of McLean, VA, for amicus curiae Novell, Inc. With him on the brief was Charles C. Carson.

Before RADER, BRYSON, and GAJARSA, Circuit Judges.

BRYSON, Circuit Judge.

This is an appeal from a decision of the United States Patent and Trademark Office's Board of Patent Appeals and Interferences in a reexamination proceeding, Appeal No.2003–0349. The Board upheld a patent examiner's rejection, in reexamination, of several claims of U.S. Patent No. 4,714,989 ("the '989 patent"). The owner of the patent, American Academy of Science Tech Center, seeks review of the Board's decision. We affirm.

I

Before the proliferation of personal computers, it was common for a multiple-user computer system to be arranged so that each user would interface with a mainframe computer by using a so-called "dumb terminal," i.e., a terminal that did not contain processors and performed only input and output functions. Several dumb terminals would be connected to a single mainframe computer, which would run the user applications. The mainframe computer would receive input from and provide output to users through the dumb terminals. The user applications run by the mainframe computer would access data that was stored in a database residing on the mainframe.

In contrast to systems using a mainframe in conjunction with dumb terminals, the '989 patent describes a network in which the processing of user applications is distributed among several computers. In the '989 patent system, user applications are run on the user stations, while the database resides on a dedicated database computer. Several user stations are networked to the database computer so that a user application running on a user station can store data to and retrieve data from the database residing on the database computer. The patent describes using a "data base simulator" to "enable[ ] an application program ... at the user station to call for storage or retrieval of data from the data center as though it were calling for data from a data base resident at the user station ...." '989 patent, col. 6, ll. 57–62.

The '989 patent was issued on December 22, 1987, on an application filed on October 20, 1986. The 1986 application was a continuation of an application filed on February 19, 1982. In 1991, American

Academy sued Novell, Inc., in the United States District Court for the Northern District of California, alleging that Novell had infringed the '989 patent. In response, Novell filed a reexamination request on June 6, 1994. The district court stayed the litigation pending the outcome of the reexamination.

During the reexamination, the examiner rejected each of the claims of the '989 patent as anticipated by several references. Four of those references, the Canaday, Lowenthal, Passafiume, and Hsiao references, are at issue in this appeal. The Canaday, Lowenthal, and Passafiume references describe what American Academy calls "back-end" systems. In such back-end systems, several mainframe computers interface with a single database or "back-end" computer. The mainframe computers run user applications and communicate with the database computer to store and retrieve data from a database that resides on the database computer. The Hsiao reference describes networking several personal computers to a database computer that is connected to a database.[1]

The claims under reexamination require a plurality of "general purpose user computers" that are connected to a "data center computer." The examiner determined that the mainframe computers in the asserted references (and the personal computers of Hsiao) anticipated the "general purpose user computers" element of the claims under examination. The examiner also found that the references taught an additional disputed claim element, that of "indirectly issuing data base calls," since in each of the references database calls from the user application to the database manager program at the database computer must be sent though some other program or hardware.

In response to those rejections, American Academy submitted arguments and declarations to the effect that the claims of the '989 patent are limited to user computers, such as personal computers, that are each dedicated to a single user. American Academy also argued that the "indirectly issuing" element should be limited to cases in which the user application, when making a database call, is not aware that it is making a remote database call but instead believes that it is making a local database call to the computer running the user application. American Academy thus in effect urged that the "indirectly issuing" limitation should be limited to the use of a database simulator program such as that described in the '989 specification. The examiner was not persuaded by American Academy's arguments and continued to reject the claims both as anticipated and as obvious in light of the cited references.

American Academy appealed the examiner's rejections to the Board, which affirmed the rejections. Although the examiner had been persuaded by the time of appeal that the patent was limited to single-user computers, the Board adopted a broader construction of the claim term "user computer" that encompassed any computer "capable of running application programs for a user." That construction reached the back-end systems of the prior art. The Board also construed the claim term "indirectly issuing" broadly to include "the request going through some other

---

1. American Academy argues that the Hsiao reference does not anticipate the invention because Hsiao lacks an enabling disclosure. In light of our conclusion that the Board did not err in finding the other references to be anticipatory, it is unnecessary for us to address that argument.

component before it is sent to the data base."

American Academy filed a rehearing request, asserting that the Board's claim construction was broader than the examiner's and that the Board's decision was thus based on a new ground of rejection. The Board granted the request, but it concluded that even under American Academy's construction it would have been obvious to replace the mainframe computers of the prior art with personal computers. In response to a further rehearing request in which American Academy asserted that the Board's obviousness rejection also constituted a new ground of rejection, the Board directed that the issue of obviousness be further prosecuted.

In subsequent proceedings before the examiner, American Academy submitted additional declarations, both as to claim construction and as to the issue of obviousness. The examiner, however, again rejected the claims as anticipated and obvious over the prior art.

American Academy appealed the rejections to the Board for a second time. The Board addressed claim 1 in detail, finding that it was representative of the other claims on appeal. Based on the principle that during examination claims should be given their broadest reasonable construction, the Board construed the term "user computer" to encompass the mainframe computers of the prior art. The Board explained that "[a]lthough the patent disclosure does refer to servicing a user in the singular, it also notes that the user could be a person, another device, or machine. . . ." The Board added that it was not persuaded by the declarations submitted by American Academy because "the declarations offer no evidence in support of appellant's definition" and "[i]nstead . . .

merely offer [the declarant's] opinions as to what the artisan would have understood upon reading the patent disclosure." The Board rejected American Academy's argument that a broad construction of the term "user computer" would vitiate the word "user." Under its definition, the Board explained, the term "user computer" did not include all computers, but excluded special purpose computers, such as those that "are not intended to interface with a user for application programming under any circumstances."

The Board further concluded that the broadest reasonable construction of "indirectly issuing a database call" requires only "that a request from the host computer go through some other component before it is sent to the database." The Board found American Academy's arguments to the contrary unpersuasive and again found the declarations submitted in support of American Academy's narrower construction to be unsupported by the evidence before the examiner. Finally, the Board upheld the alternative obviousness rejections, concluding that the examiner had established a prima facie case of obviousness that was unrebutted by American Academy's arguments or evidence.

## II

▇ We review the Board's legal conclusions de novo and uphold its factual findings if they are supported by substantial evidence. *See In re Bass,* 314 F.3d 575, 576 (Fed.Cir.2002). Anticipation is a question of fact, which we review for substantial evidence, *see In re Hyatt,* 211 F.3d 1367, 1371–72 (Fed.Cir.2000), while claim construction is a matter of law, reviewed de novo, *see In re Baker Hughes Inc.,* 215 F.3d 1297, 1301 (Fed.Cir.2000). The primary issue on appeal is the construction of

the terms "user computer" and "indirectly issuing." Construing those claim terms broadly, the Board found that each of the references, Canaday, Lowenthal, Passafiume, and Hsiao, taught both the use of "user computers" and systems that "indirectly issue" database calls. American Academy does not challenge the sufficiency of the evidence with respect to the Board's decision on any other claim limitations.

■ During examination, "claims ... are to be given their broadest reasonable interpretation consistent with the specification, and ... claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art." *In re Bond*, 910 F.2d 831, 833 (Fed.Cir.1990); *accord Bass*, 314 F.3d at 577 ("[T]he PTO must apply the broadest reasonable meaning to the claim language, taking into account any definitions presented in the specification."); *In re Cortright*, 165 F.3d 1353, 1358 (Fed.Cir.1999) ("Although the PTO must give claims their broadest reasonable interpretation, this interpretation must be consistent with the one that those skilled in the art would reach."); *Hyatt*, 211 F.3d at 1372. The "broadest reasonable construction" rule applies to reexaminations as well as initial examinations. *See In re Hiniker Co.*, 150 F.3d 1362, 1368 (Fed.Cir.1998); *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed.Cir. 1984). Giving claims their broadest reasonable construction "serves the public interest by reducing the possibility that claims, finally allowed, will be given broader scope than is justified." *Yamamoto*, 740 F.2d at 1571; *accord Hyatt*, 211 F.3d at 1372; *In re Zletz*, 893 F.2d 319, 322 (Fed.Cir.1989) ("An essential purpose of patent examination is to fashion claims that are precise, clear, correct, and unambiguous. Only in this way can uncertainties of claim scope be removed, as much as possible, during the administrative process.").

■ Construing claims broadly during prosecution is not unfair to the applicant (or, in this case, the patentee), because the applicant has the opportunity to amend the claims to obtain more precise claim coverage. *See Yamamoto*, 740 F.2d at 1571–72 ("Applicants' interests are not impaired since they are not foreclosed from obtaining appropriate coverage for their invention with express claim language. An applicant's ability to amend his claims to avoid cited prior art distinguishes proceedings before the PTO from proceedings in federal district courts on issued patents. When an application is pending in the PTO, the applicant has the ability to correct errors in claim language and adjust the scope of claim protection as needed."); *Zletz*, 893 F.2d at 321 ("[D]uring patent prosecution when claims can be amended, ambiguities should be recognized, scope and breadth of language explored, and clarification imposed."); *Hyatt*, 211 F.3d at 1372.

■ American Academy appeals the rejection of claims 1–17 and 20–26 to this court. However, the parties agree that the construction of the terms "user computer" and "indirectly issuing" is determinative as to all the claims on appeal. Claim 1 is thus representative of all the claims at issue for purposes of the appeal. It claims:

1. A method of operating a distributed data processing system including *a plurality of independent, not necessarily uniform, general purpose user computers* to run respective user application programs to process user data and a

data center computer to store, retrieve, and update user data, said user computers being selectively interconnected with said data center computer by respective data communication hardware over data communication network means, said method comprising the steps of:

(a) managing in a data center computer by means of a data base manager program a user data base of user data items to perform data operations of storing, updating, and retrieving said user data items in response to data base calls for such operations from a user computer;

(b) running a user application program in a general purpose user computer to process user data, *said user application program indirectly issuing data base calls* for data operations regarding user data items in response to requirements for said data operations by said user application program;

(c) in response to a data base call regarding a user data item from a user application program, initiating by said user computer only a data communication link with said data center computer over data communication network means;

(d) communicating said data base call from said user computer to said data center computer;

(e) performing by said data center computer said data operation regarding said user data item defined by said data base call; and

(f) communicating an appropriate response to said data base call from said data center computer to said user computer.

(emphasis added).

## A

■ American Academy first argues that the term "user computer" should be limited in the '989 patent to refer only to single-user computers. Although the claim does not contain words of restriction that would suggest that narrow construction, American Academy argues that the specification makes clear that the claim language should be given an interpretation narrower than the ordinary meaning of the claim language would suggest. This court has recognized that a patentee "may demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed.Cir. 2002); *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed.Cir. 2003) ("A patent applicant may consistently and clearly use a term in a manner either more or less expansive than its general usage in the relevant art, thereby expanding or limiting the scope of the term in the context of the patent claims."); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed.Cir.2001).

In arguing that the specification of the '989 patent makes clear that multi-user computers, such as mainframes and minicomputers, do not fall within the definition of "user computer" as that term is used in the '989 patent, American Academy points to language in the Background of the Invention portion of the specification discussing configurations that use mainframes connected to dumb terminals. According to American Academy, by pointing out the deficiencies with multi-user computers such as mainframes, the specification excludes those mainframes from the definition of user computers.

It is true that the specification suggests that, as the number of users using a main-

frame increases, the amount of processing power necessary to run all the user applications increases, and consequently the cost of a mainframe capable of handling all the requisite processing increases. '989 patent, col. 1, ll. 26–41. The specification continues by describing why one potential solution—using several processors in communication with one another to perform the role of a single processor—is inadequate. In that system, the specification explains, the overhead necessary for communication between multiple processors would consume substantial computing resources. *Id.*, col. 1, l. 42 to col. 2, l. 3.

The Background of the Invention thus highlights the problems inherent in performing all the processing necessary to run multiple user applications at a central computer, whether that computer includes only one very expensive processor or several less expensive processors consuming valuable computing resources talking to one another. The specification does not, however, disclaim the networking of mainframes to a central computer that is devoted to database access. To the contrary, the Background of the Invention appears to allow a configuration in which multiple user applications are run separately on several mainframe computers, which communicate with a database computer that is dedicated to the functions of storing and retrieving data. In such a case, several less expensive mainframe computers could be used to manage the processing of an increasing number of user applications while the overhead associated with communication among processors would be limited to communications related to the storage and retrieval of data.

American Academy argues that the specification describes the user stations in a way that distinguishes a "user computer" from a multi-user computer. In particular, American Academy points to a portion of the specification that provides as follows:

> the system of the present invention includes a *plurality of user stations each dedicated to servicing a user (which could be a person, another device, or machine)* and each functioning as a stand-alone computer, having its own central processing unit, typically a microprocessor, and equipment by which the user can communicate with the central processing unit, typically a video display and keyboard terminal. The user stations may have other peripheral equipment as well, such as disk drives, printers, card readers, or the like. The user stations service the users by executing application programs supplied by the users.

'989 patent, col. 2, ll. 35–47 (emphasis added). American Academy notes that the term "user station," which appears to be synonymous with "user computer" as used in the '989 patent, is referred to as "dedicated to servicing a user." That reference, according to American Academy, indicates that a "user station" or "user computer" must be a computer that is dedicated to a single user.

As the Director of the PTO points out in his brief, however, the specification states that a "user" can be "a person, another device, or machine," which suggests that the "user computer" could be a mainframe or minicomputer. The Director also points to a portion of the specification that provides as follows:

> Although specific equipments are shown for the user station 4 and data center 8 of FIG. 2, it should be understood that a variety of configurations could be utilized to enable the user station 4 to

operate as an interface with users and to process application programs 116, and to enable the data center 8 to serve as a storage and retrieval center for data of common interest to the user stations.

'989 patent, col. 6, ll. 79–14. The specification then proceeds to differentiate the user computers from the data center computer in terms of function, explaining that a "user station . . . would be utilized to interact with the operator, generate payroll information, produce accounting reports, process accounts payable and accounts receivable, sort, compile, process hotel or airline reservation requests, and in general process data pursuant to a variety of conventional application programs" while "[t]he data centers . . . illustratively would serve to store data relating to the personnel of a company, payroll information regarding such personnel, accounts payable and accounts receivable data, information regarding occupancies and vacancies in a hotel chain or airline system, and generally any type of data which may be of interest to more than one user station. . . ." *Id.*, col. 6, ll. 14–27. According to the Director, the specification thus makes clear that the term "user computer" is used to refer to the function of the computer in running a user application, not to the identification of the user computer as a personal computer as opposed to a mainframe.

American Academy argues that to read "user computer" to encompass mainframes and minicomputers would vitiate the word "user." The Board, however, recognized that the addition of the word "user" would "disqualify those computers that are designed as special purpose computers for some use and are not intended to be reprogrammed by users for their own benefits."

American Academy also points to the specification's reference to the Zilog Z–80 as a type of computer that could be used in a system embodying the invention. The Zilog Z–80, American Academy argues, was never intended to serve as a multi-user computer, and thus, according to American Academy, the reference to the Zilog Z–80 indicates that multi-user computers were not intended to be within the scope of "user computers" as that term was used in the '989 patent. The specification, however, describes the Zilog Z–80 as part of an "illustrative embodiment" of a "conventional microprocessor," not as an essential element of the invention. '989 patent, col. 5, ll. 27–32. Moreover, the examiner, citing a contemporaneous reference on microprocessors, determined that the Zilog Z–80 had the capability to function as a multi-user computer.

We agree with the Board that the description in the specification would not preclude a mainframe or a minicomputer from serving as the "user computer" of the invention. In general, the specification distinguishes a user computer from a data center computer in terms of function. Although some of the language of the specification, when viewed in isolation, might lead a reader to conclude that the term "user computer" is meant to refer to a computer that serves only a single user, the specification as a whole suggests a construction that is not so narrow. Instead, the specification indicates that the invention is intended to reach "a variety of configurations" including those in which the "user" is not a person, but is another device or machine. Thus, in light of the description in the specification, a construction of "user computer" that includes multi-user computers, such as mainframes or minicomputers, is not unreasonably broad.

American Academy contends that the declarations of Dr. Maryanski, submitted

at various points in the course of the reexamination proceedings, establish that one of ordinary skill in the art would understand the term "user computer" to mean a computer dedicated to a single user, and not a mainframe or minicomputer. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed.Cir.2002) ("[T]he ordinary meaning must be determined from the standpoint of a person of ordinary skill in the relevant art."); *In re Cortright*, 165 F.3d 1353, 1358 (Fed.Cir.1999) ("Although the PTO must give claims their broadest reasonable interpretation, this interpretation must be consistent with the one that those skilled in the art would reach."). The Board upheld the examiner's determination that the declarations consisted only of Dr. Maryanski's personal opinions and did not constitute persuasive evidence in support of his conclusions.

█  The Board has broad discretion as to the weight to give to declarations offered in the course of prosecution. *See Velander v. Garner*, 348 F.3d 1359, 1371 (Fed.Cir.2003) ("[A]ccord[ing] little weight to broad conclusory statements [in expert testimony before the Board] that it determined were unsupported by corroborating references [was] within the discretion of the trier of fact to give each item of evidence such weight as it feels appropriate."); *cf. Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed.Cir.1985) ("Opinion testimony rendered by experts must be given consideration, and while not controlling, generally is entitled to some weight. Lack of factual support for expert opinion going to factual determinations, however, may render the testimony of little probative value in a validity determination." (citations omitted)). Although there is "no reason why opinion evidence relating to a fact issue

should not be considered by an examiner," *In re Alton*, 76 F.3d 1168, 1175 n. 10 (Fed.Cir.1996), the Board is entitled to weigh the declarations and conclude that the lack of factual corroboration warrants discounting the opinions expressed in the declarations, *see Velander*, 348 F.3d at 1371; *Ashland Oil*, 776 F.2d at 294.

American Academy also asserts that the prosecution history of the original application that matured into the '989 patent supports its construction of the term "user computer." During prosecution, the PTO rejected the claims of the application based on a prior art patent to Anderson. The applicant characterized Anderson as including remote transaction terminals and a host data processing system, in which the host, and not the remote terminals, processed the transactions. American Academy argues that the failure of the applicant and the examiner to characterize the host computer as a "user computer" is evidence that a user computer is intended to service a single user. However, the applicant distinguished the Anderson reference on the ground that the application programs were run on the host computer, rather than on remote transaction terminals. In effect, the applicant analogized the system of Anderson to the mainframe and dumb terminal configuration described in the Background of the Invention section of the '989 patent, with the remote transaction terminals of Anderson likened to dumb terminals. Thus, it would not have made sense for the applicant to compare the host computer of Anderson with the user computers of the application, since the user computers of the application were intended to replace devices analogous to the remote transaction terminals of Anderson. Accordingly, the discussion of the Anderson reference in the prosecution history of the original application for the '989 patent

does not support American Academy's position.

Finally, American Academy points to an inconsistency between the Board's construction of the term "user computer" and that of the district court in American Academy's litigation against Novell. In the district court litigation, the court construed "user computer" to refer to a computer that serves one user at a time. However, the Board is required to use a different standard for construing claims than that used by district courts. We have held that it is error for the Board to "appl[y] the mode of claim interpretation that is used by courts in litigation, when interpreting the claims of issued patents in connection with determinations of infringement and validity." *In re Zletz*, 893 F.2d 319, 321 (Fed.Cir.1989); *accord In re Morris*, 127 F.3d 1048, 1054 (Fed.Cir.1997) ("It would be inconsistent with the role assigned to the PTO in issuing a patent to require it to interpret claims in the same manner as judges who, post-issuance, operate under the assumption the patent is valid."). Instead, as we explained above, the PTO is obligated to give claims their broadest reasonable interpretation during examination. Under that standard, it was proper for the Board to construe "user computer" to encompass the mainframes and minicomputers of the cited prior art.

B

■ American Academy also challenges the Board's construction of the claim term "indirectly issuing." American Academy urges a construction that is limited to "a user computer application program issuing a call for data as though from resident storage, coupled with an intermediate step redirecting the call to the remote data center computer." The Board, however, construed the term as "requiring only that a request from the host computer go through some other component before it is sent to the database."

The primary argument offered by American Academy is that the '989 patent's specification limits the construction of "indirectly issuing." In particular, American Academy asks us to limit that claim term to the database simulator program of the preferred embodiment described in the specification:

The data base simulator program 118 is somewhat similar in operation to a data base manager and enables an application program 116 at the user station to call for storage or retrieval of data from the data center as though it were calling for data from a data base resident at the user station 4.

'989 patent, col. 6, ll. 57–62.

■ We have cautioned against reading limitations into a claim from the preferred embodiment described in the specification, even if it is the only embodiment described, absent clear disclaimer in the specification. *See Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed.Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.' "); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed.Cir.2002).

Rather than restricting the meaning of "indirectly issuing," the specification describes the invention broadly:

In operation, a user station initiates contact (inquires) with a data center using

any of a variety of conventional protocol procedures, and the data center, which is always operating in an access mode under control of a data access control program, responds to the inquiry and communication is established.

'989 patent, col. 3, ll. 3–9. The specification makes clear that the database simulator is a preferred embodiment, and just one of the "variety of conventional protocol procedures":

> In a preferred embodiment of the present invention, the data center computer manages data bases for the independently operating user computers by means of a data base manager program. The user computers store, retrieve, and update data items in their data bases by communicating data base calls to the data center computer. The user computers run respective user application programs to process their data and to each of which is linked a data base simulator program. When a user application program reaches a point in processing at which a data operation on a data item is needed, the user application program calls the data base simulator program and supplies it with sufficient information to issue a data base call to the data center computer to perform the required data operation.

*Id.*, col. 3, ll. 29–44. Thus, the specification does not limit the term "indirectly issuing" to the use of a database simulator.

As it did in the case of the claim term "user computer," American Academy provided evidence in the form of declarations of Dr. Maryanski in support of its construction of "indirectly issuing." The Board found that those declarations were unpersuasive for the same reasons that they were found unpersuasive with respect to the term "user computer." As we ex-

plained above, the Board is entitled to give such weight to declarations as it deems appropriate. The Board was acting within its broad discretion in giving little weight to the declarations. Because the specification does not support American Academy's narrower construction of the claim term "indirectly issuing," the Board properly concluded that the broadest reasonable interpretation of "indirectly issuing" requires "only that a request from the host computer go through some other component before it is sent to the database."

American Academy does not dispute that, under the Board's claim construction, substantial evidence supports the Board's finding of anticipation. Because we affirm the Board's claim construction both as to the term "user computers" and as to the term "indirectly issuing," we affirm its finding of anticipation as well. Having upheld the Board's anticipation rejections, we do not need to address American Academy's arguments regarding the Board's rejections of the same claims on the ground of obviousness. We therefore uphold the Board's decision based on its findings that the contested claims are anticipated, and we do not address the other issues presented in the parties' briefs.

*AFFIRMED.*