NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

## IN RE FRANK ROBERT DITTO

---

2012-1182

(Serial No. 09/276,137)

---

Appeal from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences.

---

Decided: December 7, 2012

---

FRANK R. DITTO, of San Francisco, California, pro se.

RAYMOND T. CHEN, Solicitor, United States Patent and Trademark Office, of Alexandria, Virginia, for appellee. With him on the brief were MICHAEL S. FORMAN and SCOTT C. WEIDENFELLER, Associate Solicitors. Of counsel was THOMAS W. KRAUSE, Associate Solicitor.

---

Before DYK, PROST, and REYNA, *Circuit Judges.*

PER CURIAM.

Frank Ditto ("Ditto") filed Patent Application No. 09/276,137 (the "Ditto application") for a domestic cat

breed produced by mating a Bobcat, Lynx, or Bobcat Lynx species with a domestic cat. The examiner rejected all twelve claims of the patent because, *inter alia*, the claims were anticipated by prior art references and were directed to non-statutory subject matter under 35 U.S.C. § 101. The Board of Patent Appeals and Interferences (the "Board") affirmed these rejections. Because the Board was correct in holding that Ditto's application was anticipated, we *affirm*.

## BACKGROUND

The Ditto application was filed on March 25, 1999. Independent claim 1 of the Ditto application recites "[a] domestic cat breed produced by breeding a purebred cat produced by mating a Bobcat, Lynx, or Bobcat Lynx species with a domestic cat." Appellee's App. 42. Claims 2-12 are dependent claims and recite characteristics of the claimed domestic cat breed. Specifically, Ditto claims "[a] cat according to claim 1, wherein" the "cat has a deep voice like a Bobcat lynx"; "sings"; "communicates verbally"; "responds to verbal commands"; "vocally responds, [sic] to commands"; "bonds to one Alfa [sic] person like a wolf"; "responds to vocal commands"; "uses paws in a hand like manner"; "has webbed feet with extra padding of long fur in between toes"; "climbs like a bobcat and does not jump and light [sic] on it's [sic] feet like other domestic cats"; and "has two coats of fur a short coat and a long coat." *Id.* at 42.

Ditto's written description for his claimed invention asserts that the claimed breed is "[a] new and novel breed of cat for breeding, show, and pet." *Id.* at 36. It notes that "[t]his particular cat is different from other breeds, as it's [sic] breeding origins can come from a Bobcat, Lynx, or Bobcat lynx species, and [a] domestic cat." *Id.* It asserts that the cat is "bred into domesticity" but nonetheless

"maintain[s] the spirit and disposition of the wild." *Id.* The specification emphasizes that cats of "Bobcat, lynx, or Bobcat lynx species" may be bred with domestic cats to produce the claimed breed. *Id.* It further states that "[a] unique and novel disposition of this breed is that the cat has an extreme intelligence, confidence and loyalty, behaving more like a dog than other domestic cats." *Id.* The claimed cats range from nine to forty pounds, come in a variety of colors, have hind legs that are larger than their front legs, may have spotted fur or a stump tail, and have "sturdy muscular bodies." *Id.* at 36-37.

In the cat breeding world, cat breeds are registered with international organizations such as The International Cat Association ("TICA"). TICA classifies individual cats according to a three-letter "registration status code," indicating the purity of the cat's breeding. *See TICA Registration Codes*, The International Cat Association, *http://www.tica-uk.org.uk/html/reg_codes.html* (last visited November 19, 2012). One of these codes, SBT, is generally reserved for purebred cats with a three-generation pedigree. *Id.* Nothing in the written description or claims of Ditto's patent, however, explicitly references the SBT level of breeding.

Two pieces of prior art are pertinent. The first is a column titled "Home-grown Pixie-Bob is bound to capture you," published in *The Seattle Times* on July 10, 1994 ("Green"). Green describes a breed that developed naturally as the result of a bobcat mating in a barn with a family's domestic cat. The article describes the breed as having "a muscular, rangy body, thick legs, ticked coat, loose skin and short tail . . . ." Appellee's App. 45. The cats typically weighed between eight and twenty-two pounds. Green noted that "Pixie-Bobs are often called 'dogs in disguise' because of their canine-like temperament" and that they are "highly trainable." *Id.* Carol Ann Brewer,

who is credited as the founder of the Pixie-Bob breed, is quoted in the article and is referred to as the "Pixie-Bob matriarch." *Id.*

One year later, a newspaper article published in *The Bellingham Herald* ("Porter") described a new cat breed. Porter explains that "[t]he breed is called Pixie-Bob, a cross between bobcats and domestic cats." *Id.* at 43. Porter stated that, two weeks before publication of the article, the Pixie-Bob was presented before TICA, where the Pixie-Bob obtained "[o]verwhelming approval that recognizes the cat as an official breed for showing and judging". *Id.* Porter added that "the optimum specimen of a Pixie-Bob "retains the face and body features of a bob-cat—tufts of hair over the ear, spotted fur, short tail—but the general size and temperament of a domestic [cat]." *Id.* The article notes that "[t]he cats are protective, like dogs, and like to be on leashes," and that they are "100 percent people cats" with "stabilizing" personalities. *Id.* The article prominently features Brewer.

After reviewing the Ditto application, the examiner first rejected all twelve claims as directed to non-statutory subject matter under 35 U.S.C. § 101 because the particular cat breed was known as a product of nature, resulting from matings known to occur in the wild. The examiner also rejected the claims as anticipated by both Porter and Green under 35 U.S.C. §102(b).[1]

---

[1] The examiner also rejected the claims under 35 U.S.C. §112 ¶ 1 as failing to comply with the enablement requirement, finding that "[t]he specification only enables a cat having all the claimed characteristics" and that "[t]here is no guidance [in the specification] on achieving a cat having none or a portion of these characteristics." Appellee's App. 56-57. The Board reversed this rejection, and enablement is not at issue in this appeal.

Ditto appealed to the Board, which issued a decision on August 1, 2011. Its decision addressed claim 1 only, because "[t]he claims have not been argued separately and therefore stand or fall together." Appellee's App. 2 (citing 37 C.F.R. § 41.37(c)(1)(vii) (2011)). With respect to the examiner's non-statutory subject matter rejection, the Board construed the claim term "purebred" as only requiring breeding until a "desired effect is reached." *Id.* at 7. The Board found that "[n]o specific amount or type of breeding is required to obtain a 'purebred' in light of the teaching of the specification." *Id.* Because naturally occurring cats would have desired traits which satisfy the requirements of claim 1, the Board held that the claim covers non-statutory subject matter.

The Board also affirmed the examiner's anticipation rejection based on the claim construction. The Pixie-Bob cat breed disclosed by Green and Porter satisfied the requirement of claim 1 of being a breed produced by mating a Bobcat species with a domestic cat and then further mating to form a breed. Because the Board had interpreted "purebred" as merely requiring breeding until a "desired effect is reached," there was sufficient evidence "that the Pixie-Bob cats described in the Porter and Green publications were bred to the point of achieving a desired effect." *Id.* at 14. Additionally, Ditto "provided no evidence . . . suggest[ing] any difference between the Pixie-Bob cat breed of Green and Porter and the claimed cats." *Id.* at 15. The Board also rejected Ditto's attempt to read an "SBT level" limitation into the court's interpretation of purebred, as the phrase did not appear in the claims or even in Ditto's specification.

The Board denied rehearing. This appeal followed. This court has jurisdiction under 28 U.S.C §1295(a)(4)(A).

DISCUSSION

When reviewing Board determinations, we review "questions of law, such as claim construction and statutory interpretation, *de novo*." *In re NTP, Inc.*, 654 F.3d 1268, 1273 (Fed. Cir. 2011). In particular, claim construction by the PTO is a question of law that we review de novo. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) However, "[t]he Board's factual determinations, including what the examiner considered during prosecution, are reviewed for substantial evidence." *NTP*, 654 F.3d at 1273. Anticipation is a question of fact. *In re Gleave*, 560 F.3d 1331, 1334-35 (Fed. Cir. 2009). What the prior art discloses is also a factual inquiry. *Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.*, 73 F.3d 1085, 1088 (Fed. Cir. 1995).

I

We affirm the Board's rejection on grounds of anticipation and do not reach its section 101 rejection. We begin with claim interpretation. The parties argue for different interpretations of "purebred." Ditto contends that the Board misinterpreted "purebred" as referring to breeding to achieve "a desired effect". Ditto urges that the term refers to a breed that "has reached a point of stabilization where the stabilized breed can reproduce itself on it's [sic] own." Appellant's Br. 1-2. He also argues that the dictionary definition of "breed" supports his position, and that the claim should be limited to cats bred at the "SBT level" (third generation) or perhaps that have reached a fifth generation of breeding.

However, as the Board properly noted, claim terms are given their broadest reasonable interpretation as they would be understood by persons of ordinary skill in the art in the light of specification. *In re Zletz*, 893 F.2d 319, 321-22 (Fed. Cir. 1989). The Board explained that Ditto

did not include a definition of "purebred" in either the claims or the specification. Though the specification states that the claimed cats are "bred with a domestic cat until [they] reach[] Domestic standards," and that such breeding is done "until the desired effect is reached," Appellee's App. 38, Ditto does not explain how either the terms "Domestic standards" or "desired effect" supports an interpretation of the term "purebred" that includes the limitations he seeks (such as the reproducibility and SBT level limitations). In our view, the Board properly held that a person with ordinary skill in the art could interpret "purebred" as "breeding until a desired effect is reached." Nothing in the dictionary definition of "breed" that appears in the record undermines this conclusion; it merely reiterates that a "breed" is "a distinctive group of domestic animals differentiated from the wild type under the influence of man and usu[ally] incapable of maintaining its distinctive qualities in nature" *Webster's Third New International Dictionary of the English Language* 274 (1993). These "distinctive qualities," in our view, are akin to the "desired effects" under the Board's interpretation that could be achieved as a result of any breeding that occurs.

With regard to the SBT level, we, like the Board, find no definition or description of that term in either the claims or the specification.  In addition, dependent claims 2-12 also do not reference the SBT level; they only recite specific functional behaviors and characteristics of the cat produced. There is also nothing in the specification or claims suggesting that three or more generations of breeding are required to achieve a purebred level, SBT or otherwise. Thus, we hold that Ditto's proposed interpretation is not supported by the specification, and we find no error in the Board's claim construction covering cats which are bred to achieve any "desired effect."

## II

In light of the claim construction of "purebred," we consider whether the asserted claims are anticipated by Porter and Green.

Ditto argues that the Green and Porter prior art does not anticipate the claimed breed because, in his view, the breed described in the references was not "considered a purebred at this stage of the breeding chain known to those skilled in the art." Appellant's Br. 6. He contends that the Green and Porter articles only "suggest hopes of joining a breeding program," and that "possible acceptance as a breed" was not finalized until May 1998. *Id.* This argument was squarely rejected by the Board, which found that both Green and Porter described the Pixie-Bob as a cat breed as of 1995.[2] Ditto did not file his patent application until March 25, 1999, which is after May 1, 1998—the date at which Ditto acknowledges that the Pixie-Bob was a recognized purebred breed. This date— May 1, 1998—was when TICA placed the Pixie-Bob breed into TICA's Championship Category II.

Moreover, the Green and Porter references clearly anticipate claim 1. They disclose characteristics of the purebred cats that are desired effects. For example, Green notes that Pixie-Bobs are "[o]ften characterized as 'dogs in disguise' because of their canine-like temperament" and that Pixie-Bobs are "highly trainable" and loyal. Appellee's App. 45. And Porter notes that "a Pixie-Bob . . . retains the face and body features of a bobcat [and] the

---

[2]   The references articulate that "[t]he breed is called Pixie-Bob, a cross between bobcats and domestic cats," Appellee's App. 44, and that these cats could be the result of a bobcat mating in a barn with a family's domestic cat. The presentation of the Pixie-Bob before TICA and its recognition as "an official breed for showing and judging" were clearly stated in Porter's article. *Id.*

general size and temperament of a domestic [cat]" and that the cats have "stabilizing" personalities and are "100 percent people cats." *Id.* at 43-44 (internal quotation marks omitted). The similarities between Ditto's claims and written description of the breed and the prior art references are striking. Substantial evidence supports the Board's conclusion that claim 1 is anticipated by Porter and Green. The Pixie-Bob breed of cats describes cats that were bred until certain "desired effects" were achieved. We do not consider separately whether dependent claims 2-12 are anticipated because, as the board noted below, these claims stand or fall together with claim 1. *See* 37 C.F.R. § 41.37(c)(1)(iv) (noting that, when claims are argued to the Board as a group, "all claims subject to the ground of rejection stand or fall together"). And on appeal, Ditto has only made arguments with respect to claim 1.

Finally, Ditto argues that he was denied a proper hearing and suffered prejudice. We observe that Ditto was provided a full opportunity to prosecute and appeal, and that both the examiner and the Board have carefully and comprehensively analyzed his claims. There was no procedural error.

For the above reasons, we *affirm* the Board's decision.

COSTS

No costs.